# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>ALL FUNDS IN JP MORGAN CHASE BANK ACCOUNT NUMBER 000000564673017 | )<br>)<br>)<br>)<br>)<br>) |

**APPLICATION FOR SEIZURE WARRANT**

Case No. 2:24-MJ-7390

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, <u>Joseph J. Kacic II</u>, a federal law enforcement officer or an attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property is subject to seizure by and forfeiture to the United States pursuant to 18 U.S.C. § 981(b) and 18 U.S.C. § 981(a)(1)(C):

*All funds in JP Morgan Chase Checking bank account number 000000564673017*

located in the Central District of California, in connection with one or more violations of 18 U.S.C. §§ 1343, 1344, 1956, and 1957.

The basis for the seizure under 18 U.S.C. § 981(b) is that the funds represent proceeds of the alleged criminal violations, and represent *(check one or more)*:

☐ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The seizure is related to one or more violations of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1344 | Bank Fraud |
| 18 U.S.C. §§ 1956 and 1957 | Money Laundering |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ *Joseph J. Kacic II*
*Applicant's signature*

Joseph J. Kacic II, Special Agent, IRS
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA: Tara B. Vavere

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT**

I, Joseph J. Kacic II, being duly sworn, hereby depose and
state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent with the Internal Revenue
Service, Criminal Investigation ("IRS-CI") and have been so
employed in this capacity since September 2009. My duties as an
IRS-CI Special Agent include the investigation of possible
criminal violations of the Internal Revenue Code (Title 26,
United States Code), the Bank Secrecy Act (Title 31, United
States Code), the Money Laundering Control Act of 1986 (Title
18, United States Code, Sections 1956 and 1957), and other
related offenses. I successfully completed the approximately 13-
week Criminal Investigator Training Program at the Federal Law
Enforcement Training Center and the approximately 14-week
Special Agent Basic Training Program at the Internal Revenue
Service National Criminal Investigation Training Academy, both
located in Glynco, Georgia. I have been trained in accounting,
financial investigative techniques, investigations of alleged
criminal violations of the Internal Revenue laws and other
financial crimes, and the laws of search and seizure.  Prior to
my employment with IRS-CI, I earned a Bachelor of Business
Administration degree with an emphasis in accounting.

2.    In the course of my employment, I have conducted or
assisted in a number of criminal investigations involving
violations of federal tax law, money laundering and related

offenses, including wire and bank fraud, and other illegal schemes impacting financial institutions. I have written search and seizure warrant affidavits and participated in the execution of numerous federal search warrants involving alleged criminal violations during which evidence of criminal violations were seized. I have been assigned to work with the U.S. Department of Justice and other law enforcement partners to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 pandemic.

3.    The facts set forth in this affidavit are based upon my personal observations, knowledge, my training and experience, examination of documents and records, review of information contained in government databases, and information obtained from various law enforcement personnel and witnesses. This investigation involves a joint investigation of IRS-CI, the Federal Deposit Insurance Corporation Office of Inspector General (FDIC-OIG), Homeland Security Investigations ("HSI"), the Treasury Inspector General for Tax Administration ("TIGTA") and the Small Business Administration Office of Inspector General ("SBA-OIG").

4.    The information in this affidavit is based on evidence obtained in the course of the investigation conducted by all the involved federal law enforcement agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this

matter.  All dates, times, and dollar amounts described in this Affidavit are approximate.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

5.  This affidavit is made in support of application for warrants to seize the following:

a.  All funds in JP Morgan Chase bank account number 000000564673017 (the "SUBJECT JPMC ACCOUNT") held in the name of Bruce Choi;

b.  All virtual currency held at Kraken (Payward Interactive, Inc.) in account number AA87 N84G NTRX V33A ("the SUBJECT KRAKEN ACCOUNT"), held in the name of Bruce Choi;

c.  All virtual currency held in the electronic wallet bearing address: bc1qync0rq89gq5jpqtnljmwg0sy3hgf6mqv0rmx6e (the "SUBJECT BITCOIN WALLET") (collectively, the "SUBJECT PROPERTY").

6.  There is probable cause to believe that the SUBJECT PROPERTY is subject to seizure pursuant to 18 U.S.C. § 981(b) and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because the SUBJECT PROPERTY constitutes or is derived from proceeds traceable to one or more violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud) which are specified unlawful activities as defined in 18 U.S.C. § 1956(c)(7)(a). There is further probable cause to believe that the SUBJECT PROPERTY was involved in one or more financial transactions in violation of 18 U.S.C. §§ 1956 and 1957 (money laundering),

making it subject to seizure and forfeiture pursuant to 18
U.S.C. § 981 (b) and (a)(1)(A).

7.    In addition, the SUBJECT PROPERTY is subject to
seizure pursuant to 18 U.S.C. § 982(a)(2)(A) and 21 U.S.C.
§ 853(f) because there is probable cause to believe that the
SUBJECT PROPERTY  would, in the event of conviction on the
alleged underlying offenses, be subject to criminal forfeiture,
and an order under 21 U.S.C. § 853(e)(providing for restraining
orders and injunctions) would not be sufficient to assure the
availability of property for forfeiture.

### III.    <u>SUMMARY OF PROBABLE CAUSE</u>

8.    According to records obtained from a federally-insured
lender, described in more detail below, Bruce Hedong Choi
("CHOI") submitted a fraudulent loan application on behalf of
his entity, a purported retail business by the name of Premier
Republic, which resulted in $1,995,000 in loan proceeds. CHOI
also submitted a fraudulent Economic Injury Disaster Grant
Application to the Small Business Administration ("SBA") that
resulted in a $10,000 grant. Both the loan and the grant
application included altered documentation and other false
information which CHOI used to fraudulently obtain a loan
guaranteed through the Paycheck Protection Program and a Grant
from the SBA. CHOI received the grant proceeds on May 5, 2020
and the loan proceeds on May 15, 2020. Then, between May 20,
2020 and July 17, 2020, CHOI conducted 91 wire transactions from

the SUBJECT JPMC ACCOUNT to an account at Prime Trust LLC[1] ("Prime Trust"). The total wire transactions from the SUBJECT JPMC ACCOUNT to Prime Trust were $1,925,000. Between June 1, 2020 and July 13, 2020, CHOI used the Prime Trust account to purchase hundreds of thousands of dollars in crypto currency. Between July 16, 2020 and July 27, 2020, CHOI transferred $1,577,327.91 back to the SUBJECT JPMC ACCOUNT from his Prime Trust account. Between July 17, 2020 and October 29, 2020, CHOI transferred $1,629,990 from the SUBJECT JPMC ACCOUNT to the SUBJECT KRAKEN ACCOUNT where he converted the cash to cryptocurrency. CHOI moved that cryptocurrency through various cryptocurrency exchanges and on February 26, 2021 purchased 43.865965 Bitcoin ("BTC") worth over $2,000,000 at the time of the purchase. From April 3, 2022 to September 24, 2022, CHOI deposited a total of 43.0523488 BTC from his February 26, 2021 BTC purchase into his cryptocurrency wallet connected to the SUBJECT KRAKEN ACCOUNT. On September 28, 2023, CHOI moved 20 BTC from the SUBJECT KRAKEN ACCOUNT to a separate Bitcoin wallet from which, through a series of transactions, he eventually transferred 19.62665561 BTC to the SUBJECT BITCOIN WALLET.

---

[1] Prime Trust LLC was a wholly-owned subsidiary of Prime Core Technologies, Inc, which is a Nevada-domiciled retail trust company. Prime Trust LLC provided trust services and operated as a financial technology-driven company dealing in cryptocurrency, FinTech software development and software services.

## IV.   STATEMENT OF PROBABLE CAUSE

### A. BACKGROUND REGARDING CARES ACT PROGRAMS

#### i.  Overview of the Paycheck Protection Program

9.    The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

10.   In order to obtain a PPP loan, a qualifying business was required to submit a PPP loan application, signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

11.    A PPP loan application must be processed by a participating lender. If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the SBA. Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

12.    PPP loan proceeds must be used by the business on certain permissible expenses, such as payroll costs, interest on mortgages, rent, and utilities.

13.    Under the PPP, the maximum loan amount is the lesser of $10 million or an amount calculated using a payroll-based formula.  The definition of payroll costs expressly excludes compensation of an individual employee in excess of an annual salary of $100,000.

      ii.  Overview of the Economic Injury Disaster Loan and EIDL Advance

14.    The SBA, through its Office of Disaster Assistance ("ODA"), provides financial assistance to businesses of all sizes, most private non-profit organizations, homeowners, and renters following a declared disaster. In addition, SBA provides eligible small businesses necessary working capital to help overcome the economic injury of a declared disaster. Section 7(b)(2) of the Small Business Act, as amended, authorizes the SBA's Economic Injury Disaster Loan ("EIDL") Program. SBA can make loans to eligible small businesses, eligible non-profit organizations, and eligible small agricultural cooperatives

located in a disaster area that suffered substantial economic injury as a result of a disaster.

15.  On March 13, 2020, the President of the United States determined that the ongoing Coronavirus Disease 2019 (COVID-19) pandemic was of sufficient severity and magnitude to warrant an emergency determination under section 501(b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5207.  Consequently, SBA has declared all states and territories eligible for EIDL assistance.

16.  Small businesses and non-profit organizations of any size affected by COVID-19 could apply for an EIDL if they met certain requirements, such as being in operation before February 1, 2020, and being a sole proprietorship or independent contractor.

17.  Eligible entities qualified for loans up to $2 million with loan terms of up to thirty years.  Proceeds may be used for working capital, including payroll costs, salaries, and sick leave, rent and/or mortgage payments, material costs, and preexisting debt that could have been paid had the disaster not occurred.

18.  COVID-19 EIDL applicants were also eligible for an EIDL Advance of up to $10,000 that could be requested immediately. There was no requirement to repay the advance, even if the applicant was denied an EIDL loan.  The EIDL advance could be used for working capital to meet ordinary and necessary financial obligations that could not be met as a direct result of the disaster, including payroll costs, salaries, sick leave,

rent and/or mortgage payments, material costs, and preexisting debt.

19.  SBA relied upon the self-certifications contained in the application to verify that the applicant was an eligible entity to receive the EIDL and/or EIDL Advance.  The self-certification section read:

a.  "CERTIFICATION AS TO TRUTHFUL INFORMATION: By signing this application, you [the applicant] certify that all information in your application and submitted with your application is true and correct to the best of your knowledge, and that you will submit truthful information in the future."

b.  "WARNING: Whoever wrongfully misapplies the proceeds of an SBA disaster loan shall be civilly liable to the Administrator [of the SBA] in an amount equal to one-and-one half times the original principal amount of the loan under 15 U.S.C. 636(b).  In addition, any false statement or misrepresentation to the SBA may result in criminal, civil or administrative sanctions including, but not limited to: 1) fines and imprisonment, or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 3571, and any other applicable laws; 2) treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729; 3) double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 U.S.C. 3802; and 4) suspension and/or debarment from all Federal procurement and non-procurement transactions."

20.  EIDL Advance amounts were based off the business's reported number of employees as of January 31, 2020.  Applicants

were permitted to receive a maximum EIDL Advance of $10,000.  In
practice, SBA provided $1,000 in EIDL Advance funds for each
employee on the applicant's payroll up to the maximum amount of
$10,000.

### B. RELEVANT ENTITIES AND BANK ACCOUNTS

#### i. CHOI'S Purported Retail Business, Premier Republic

21.  Premier Republic is purported to be a sole
proprietorship based in Los Angeles, California selling retail
electronics and is wholly owned by CHOI. However, it appears
from this investigation that Premier Republic did not exist as
an actual on-going business and was instead created by CHOI for
the purpose of fraudulently obtaining COVID-19 relief money.

#### ii. The SUBJECT JPMC ACCOUNT

22.  On or about November 4, 2019, CHOI opened the SUBJECT
JPMC ACCOUNT under the name "Bruce Choi" and provided an
electronic signature. CHOI used his residential address (3810
Wilshire Boulevard, Los Angeles, California), and his California
Driver License Number, to open the account and did not make any
initial deposit. The first deposit into the SUBJECT JPMC ACCOUNT
was made by Lyft, Inc. and occurred on November 12, 2019.
Between the date the account was opened and the date that the
EIDL loan was deposited, there were miscellaneous deposits made
to the SUBJECT JPMC ACCOUNT consisting of deposits from Lyft,
Inc., Uber Technologies, Inc., a cashier's check transferring
funds from a Bank of America account CHOI closed, and what
appears to small deposits from a family member of CHOI's. Prior

to the deposit of the $10,000 fraudulent EIDL advance payment on May 5, 2020, the account balance was $4,629.42. The fraudulent PPP loan deposit was made on May 15, 2020 in the amount of $1,995,000.

### iii.  CHOI'S Cryptocurrency Account at Prime Trust

23.  On or about May 19, 2020, which was after CHOI received the fraudulent loan and grant proceeds, CHOI opened a cryptocurrency account at Prime Trust under the name, "Bruce Choi." As part of the account opening process, CHOI provided Prime Trust with a bank statement from the SUBJECT JPMC ACCOUNT for the period April 16, 2020, to May 15, 2020, as well as a copy of his United States Passport.

### iv.  The SUBJECT KRAKEN ACCOUNT

24.  On or about September 4, 2019, CHOI opened the SUBJECT KRAKEN ACCOUNT and provided the following identifying documents: a picture CHOI's California Driver License, a picture of CHOI's Social Security Card, and a self-portrait showing CHOI's face and CHOI holding his California Driver License and a hand written note stating, "Only for trading digital currency on www.kraken.com" with his signature and dated "9/4/19".

### C. PPP APPLICATION TO CELTIC BANK

25.  At all times relevant here, Celtic Bank, a regulated financial institution that was federally insured by the Federal Deposit Insurance Corporation, was an approved SBA lender and participated as a lender in the PPP.

26.  On or about May 5, 2020, CHOI submitted an electronic PPP application to Blue Vine, Inc., an agent acting on behalf of

Celtic Bank, in the name of Premier Republic seeking $1,995,000 in PPP funds. On the application, CHOI claimed to be the 100% owner of Premier Republic. The EIN used for this loan was 85-0861755. CHOI represented that Premier Republic had one employee and an average monthly payroll of $798,000. The purpose of the loan was for "payroll."

27.   CHOI submitted falsified records to Blue Vine, Inc., in support of Premier Republic's loan application and made several representations or omissions in the loan application for Premier Republic submitted to Blue Vine, Inc. that I believe were false.  As support for Premier Republic's representations relating to its wage expenditures, CHOI submitted a purported bank statement from Chime Bank that appears to have been altered or fabricated.  The statement states that it is for the period of "February 01, 2020 - February 31, 2020," indicating that it covers a non-existent date of February 31, 2020. The bank statement only showed two transactions: (1) a transfer from Intuit[2] into the Chime account in the amount of $798,000 on February 15, 2020, the same amount as CHOI declared as payroll on his loan application, and (2) a transfer out of the Chime account in the amount of $798,000 to the SUBJECT JPMC ACCOUNT that purportedly occurred on February 30, 2020, another nonexistent date.  The transfer to the SUBJECT JPMC ACCOUNT was characterized as a "Direct Deposit," even though such a debit

---

[2] Intuit is the parent company of QuickBooks. QuickBooks provides accounting software and services, including full payroll services.

transaction would have been a withdrawal or transfer from, not a deposit to, the Chime account.

28.  In addition, Chime Bank's records for CHOI's account do not include the purported $798,000 deposit into or transfer from that account in February 2020, do not indicate that any transactions occurred in the account in February 2020, and the transactions that did occur in other months were orders of magnitude smaller than the purported $798,000 transactions, as none were larger than $7,000.  Furthermore, the records for the SUBJECT JPMC ACCOUNT do not show any transaction on the purported "February 30, 2020" date of transfer from the Chime Bank account nor do they indicate a transfer of $798,000 into the SUBJECT JPMC ACCOUNT on any date in February or March 2020.

29.  CHOI also submitted a document that purported to be an IRS Form 1040 – Schedule C, Profit and Loss from Business ("Schedule C") for 2019, that I believe is not genuine. The purported Schedule C stated that Premier Republic was involved in "Electronic Shopping," and had Gross Receipts of $11,760,200, Cost of Goods Sold of $2,187,200, and a Gross Profit of $9,576,000, but purportedly had no business expenses. The Schedule C stated that CHOI's Social Security Number ("SSN") ended in 0789, however, CHOI's SSN, which was submitted to Blue Vine, Inc. when initially setting up his online account, actually ends in 0780. Although CHOI claimed to Blue Vine, Inc. in May 2020 that Premier Republic had an average monthly payroll of $798,000, the Schedule C stated that Premier had no ($0) wage expenses in the entire calendar year of 2019. The Schedule C

also asserted that Premier Republic spent nothing ($0) for purposes such as insurance, rent, maintenance, taxes, and utilities. I believe that the 2019 Schedule C submitted by CHOI on behalf of Premier Republic to Blue Vine, Inc. was a false document created for the purpose of applying for and obtaining a PPP loan.

30.  On or about May 4, 2020, as a result of the loan application to Blue Vine, Inc., which included the above false representations, omissions, and falsified documents, the loan was approved. On or about May 15, 2020, Celtic Bank sent a wire transfer in the amount of $1,995,000 to the SUBJECT JPMC ACCOUNT. The balance of the SUBJECT JPMC ACCOUNT before the $1,995,000 deposit was $14,420.31, however $10,000 of that balance was from the fraudulent EIDL application CHOI filed with SBA, which is detailed below.

### D. ECONOMIC INJURY DISASTER LOAN TO SBA

31.  On or about April 10, 2020, CHOI applied for an EIDL in the amount of $44,776,128, through SBA, under the business name "Bruce", and used his own SSN. CHOI stated that the business was involved in Real Estate and Property Management/Realty with ten employees. CHOI stated that the Gross Revenues for the business were $475,000,000 and the Cost of Goods Sold were $84,000,000. In the bank account section of the loan application, CHOI used the SUBJECT JPMC ACCOUNT. CHOI checked the yes box that certified, "[…] under penalty of perjury under the laws of the United States that the above is true and correct."

32. However, CHOI's representations appear to have been false. Based on searches of California Secretary of State records and Lexis Nexis records done by another agent and me, no business named "Bruce" associated with CHOI was found and no results were found for the name "Bruce Choi."

33. On May 5, 2020, CHOI received a $10,000 deposit in the SUBJECT JPMC ACCOUNT from the United States Treasury Department which were the proceeds of the SBA EIDL Advance from his fraudulent EIDL application.

34. Based on my review of the SUBJECT JPMC ACCOUNT records, there is no significant activity in the account related to any real estate or property management, nor are there any payments that appear to be for payroll purposes. The majority of the transactions over $1,000 involve the PPP funds received from CHOI's fraudulent PPP loan application, and the $10,000 EIDL advance CHOI received from the abovementioned EIDL application.

### E. TRANSFER AND MOVEMENT OF LOAN PROCEEDS

35. Between May 20, 2020, and July 15, 2020, CHOI sent 91 wire transfers from the SUBJECT JPMC ACCOUNT to his cryptocurrency account at Prime Trust totaling $1,925,000. Ninety of these wire transactions contained more than $10,000 of criminally derived PPP loan proceeds and constitute violations of 18 U.S.C. § 1957. Attached hereto as Appendix A is a summary chart of those 91 transactions.

36. On June 1, 2020, CHOI used approximately $99,040.06 of the funds he transferred from the SUBJECT JPMC ACCOUNT to Prime Trust to purchase 99,040.05663 Tether USD ("USDT"), a form of

15

cryptocurrency using the Ethereum network and a stablecoin[3] tied to the U.S. Dollar, from Binance US ("Binance"), a cryptocurrency exchange, and then transferred it to an electronic wallet ("Wallet-1")[4].

37.  On June 16, 2020, CHOI used approximately $211,081.39 of the funds he transferred from the SUBJECT JPMC ACCOUNT to Prime Trust to purchase 211,081.38617 USDT from Binance and then transferred it to Wallet-1.

38.  On July 13, 2020. CHOI used approximately $37,652.43 of the funds he transferred from the SUBJECT JPMC ACCOUNT to Prime Trust to purchase 37,652.42867 USDT from Binance and then transferred it to Wallet-1.

> i.  July 2020 Transactions Laundered Back Into the SUBJECT JPMC ACCOUNT

39.  Between July 16, 2020 and July 24, 2020, CHOI conducted four wire transactions involving proceeds of his wire fraud from Prime Trust to the SUBJECT JPMC ACCOUNT totaling $1,577,327.91:

---

[3] Stablecoins are a type of cryptocurrency whose value is tied to another asset class to keep a stable, steady value. The most popular kind of stablecoins are fiat-backed stablecoins, which are tied to currencies such as the U.S. dollar.
[4] The address for Wallet-1 is 0x075bd01a2c8e5a572F6CdFF8542D8f3564887F14.

| Item | Date of Transaction | Description of Transaction | Disposition of Funds | Transaction Amount |
|------|---------------------|----------------------------|----------------------|--------------------|
| 1 | 07/16/2020 | Wire Transfer | From Prime Trust to JPMC 3017 | $109,985.00 |
| 2 | 07/20/2020 | Wire Transfer | From Prime Trust to JPMC 3017 | $468,000.00 |
| 3 | 07/24/2020 | Wire Transfer | From Prime Trust to JPMC 3017 | $969,985.00 |
| 4 | 07/27/2020 | Wire Transfer | From Prime Trust to JPMC 3017 | $29,357.91 |
| | | | **Total** | **$1,577,327.91** |

ii.  Fraudulently Derived Proceeds Funding The SUBJECT
        KRAKEN ACCOUNT

40.  Beginning on July 17, 2020, CHOI conducted 21 wire
transactions involving proceeds of his wire fraud scheme from
the SUBJECT JPMC ACCOUNT to the SUBJECT KRAKEN ACCOUNT totaling
$1,634,990. Prior to the deposits on July 17, 2020, the SUBJECT
KRAKEN ACCOUNT (which CHOI opened on November 19, 2019)
contained a zero balance. Of the 21 wire transactions from the
SUBJECT JPMC ACCOUNT to the SUBJECT KRAKEN ACCOUNT, 20
transactions consisted of at least $10,000 in criminally derived
proceeds.

iii.  Purchases of USDT and Transfers To And From
         Wallet-1

41.  As described above in paragraphs 37 – 39, between June
1, 2020 and July 13, 2020, CHOI made three purchases totaling
347,773.87147 USDT from criminally derived proceeds deposited in
Prime Trust and transferred to Wallet-1, each of which consisted
of at least $10,000 in fraudulent proceeds.

42.  Starting on July 20, 2020, CHOI conducted 333
purchases of USDT using fraudulent proceeds from THE SUBJECT

17

KRAKEN ACCOUNT and transferred the purchases to Wallet-1, over the course of four transactions, totaling approximately $1,130,686.62. More specifically, on or about July 20, 2020, CHOI purchased 99,786.4271 USDT with the SUBJECT KRAKEN ACCOUNT. At the time of the transaction, the $99,786.4271 used to make the USDT purchase was funded entirely with proceeds of the fraud scheme. Also on July 20, 2020, CHOI transferred the 99,786.4217 USDT from the SUBJECT KRAKEN ACCOUNT to Wallet-1. The purchase of the 99,786.4217 USDT was funded entirely with proceeds of the fraud scheme.

43. The following chart identifies four USDT transactions from the SUBJECT KRAKEN ACCOUNT to Wallet-1:

| Item | Date of Transaction | Description of Transaction | Disposition of Funds | Transaction Amount |
|------|---------------------|---------------------------|----------------------|---------------------|
| 1 | 07/20/2020 | Wire Transfer | From Kraken V33A to Wallet-1 | 99,785.9271 USDT |
| 2 | 07/21/2020 | Wire Transfer | From Kraken V33A to Wallet-1 | 54,881.7355 USDT |
| 3 | 08/09/2020 | Wire Transfer | From Kraken V33A to Wallet-1 | 355,369.9901 USDT |
| 4 | 08/12/2020 | Wire Transfer | From Kraken V33A to Wallet-1 | 620,648.9697 USDT |

44. On October 3, 2020, CHOI moved 500,000 USDT from Wallet-1 to another electronic wallet ("Wallet-2")[5]

45. The following chart is a summarization of the movement of 1,999,273.267449 USDT into Wallet-2:

---

[5] The address for Wallet-2 is 0xd45aC1385dAba8F49370a766D479ED5839Ff8457.

| Item | Date of Transaction | Description of Transaction | Disposition of Funds | Transaction Amount |
|------|---------------------|----------------------------|----------------------|--------------------|
| 1 | 10/03/2020 | Wire Transfer | From Wallet-1 to Wallet-2 | 500,000 USDT |
| 2 | 10/03/2020 | Wire Transfer | From Wallet-1 to Wallet-2 | 997,276.259349 USDT |
| 3 | 12/28/2020 | Wire Transfer | From Kraken V33A to Wallet-2 | 2.5 USDT |
| 4 | 12/28/2020 | Wire Transfer | From Kraken V33A to Wallet-2 | 501,994.5081 USDT |

46. On or about January 4, 2021, CHOI conducted three transfers of stablecoins from Wallet-2 to a wallet ("Wallet-3")[6] at Binance which was held under CHOI's name. The approximate value of the stablecoins that CHOI deposited into Wallet-3 was $2,000,945.59 which consisted of approximately $1,982,662.09[7] of fraud proceeds directly traceable to the fraudulent PPP loan and the fraudulent EIDL advance.

47. On February 26, 2021, CHOI used the funds in Wallet-3 to purchase 43.865965 BTC over the course of eight transactions for an approximate total of $2,001,165.66. CHOI then transferred the BTC to four separate electronic wallets ("Wallet-4", "Wallet-5", "Wallet-6", "Wallet-7")[8]:  Wallet-4 received 1.995

---

[6] The address for Wallet-3 is 0x348523DEEe68bC4F0ddced9cCdF61d46F8E14D1b.

[7] This number is derived from the net amount of money that was moved from the SUBJECT JPMC ACCOUNT to Prime Trust and back to the SUBJECT JPMC ACCOUNT and then from the SUBJECT JPMC ACCOUNT to the SUBJECT KRAKEN ACCOUNT ($1,925,000.00-$1,577,372.91+1,634,990.00=$1,982,662.09).

[8] The address for Wallet-4 is bc1qxzy075m9uefk5mj6t2al4qeww7fr5uqy3vcwzj.
The address for Wallet-5 is bc1qlezs8ydppyyds769xfkvnalhw93f7tk489xcww.
The address for Wallet-6 is bc1qalgq92ply36n5mz7yne5xvjhlrjcrs7wen6l84.
The address for Wallet-7 is bc1qpudpg23dk0kzwljq6wf4fwmpa6prkntfyahjz8.

BTC, Wallet-5 received 14.1995 BTC, Wallet-6 received 14.9995 BTC, and Wallet-7 received 12.62165809 BTC. A total of 43.82015809 BTC moved from CHOI's account at Binance to Wallet-4, Wallet-5, Wallet-6, and Wallet-7. Of the 43.82015809 BTC, 43.0523588 was eventually deposited into an electronic wallet utilized by CHOI at Kraken and connected to the SUBJECT KRAKEN ACCOUNT ("Wallet-8")[9]. The full transaction details can be found at Appendix B attached to the end of this affidavit.

48. There were a total of 11 BTC deposits into Wallet-8 between April 3, 2022 and September 24, 2022 for a total of 43.0523488 BTC.

49. On September 28, 2023, CHOI moved 20 BTC from the SUBJECT KRAKEN ACCOUNT to a self-custody wallet[10] ("Wallet-9").[11] Since the initial transfer to Wallet-9, CHOI has transferred the balance of Wallet-9 to five different self-custody wallets, as shown on Appendix B, culminating in the transfer or 19.62665561 BTC into the SUBJECT BITCOIN WALLET on October 18, 2024.[12]

V.  **CONCLUSION**

50. In summary, there is probable cause to believe that CHOI created Premier Republic for the purpose of defrauding the

---

[9] The address for Wallet-8 is 39XnkZb43BcwJ8iJGWwMoxCMZHv8PRLjeX.
[10] As I understand, a self-custody wallet is a cryptocurrency wallet where the private key is held only by the person who owns the wallet, as opposed a custodial wallet where the key is held by a cryptocurrency exchange, such as Kraken. A self-custody wallet ensures that only the owner has access to the funds held in the wallet.
[11] The address for Wallet-9 is bc1q3a375qmafn88h9ukfj6ak532e0nwsxkx6j6n29.
[12] The address for SUBJECT BITCOIN WALLET is bc1qync0rq89gq5jpqtnljmwg0sy3hgf6mqv0rmx6e.

Economic Injury Disaster Loan program and the Payroll Protection
Program. CHOI received via wire transfer over $2,000,000 in
fraudulent proceeds from these programs and deposited them into
the SUBJECT JPMC ACCOUNT. Rather than spending any of the relief
proceeds on actual business or payroll expenses, CHOI instead
laundered the proceeds over the course of dozens of transactions
to Prime Trust where he purchased hundreds of thousands of US
dollars' worth of cryptocurrencies. CHOI laundered the remaining
dollars to the SUBJECT KRAKEN ACCOUNT through the SUBJECT JPMC
ACCOUNT and, over the course of hundreds of purchases, converted
the rest of the fraudulent proceeds into cryptocurrencies. In
February 2021, CHOI converted all of his cryptocurrencies into
over 43 BTC and moved it all to the SUBJECT KRAKEN ACCOUNT. From
the SUBJECT KRAKEN ACCOUNT, CHOI moved 20 BTC to a self-custody
wallet. From that wallet, 19.62665561 BTC were moved to the
SUBJECT BITCOIN WALLET.

51.  I submit that there is probable cause to believe that
the SUBJECT PROPERTY is subject to seizure pursuant to 18 U.S.C.
§ 981(b) and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C)
because the SUBJECT PROPERTY constitutes or is derived from
proceeds traceable to one or more violations of 18 U.S.C. § 1343
(Wire Fraud) and 18 U.S.C. § 1344 (Bank Fraud) which are
specified unlawful activities as defined in 18 U.S.C.
§ 1956(c)(7)(a). There is further probable cause to believe that
the SUBJECT PROPERTY was involved in one or more financial
transactions in violation of 18 U.S.C. §§ 1956 and 1957 (money

laundering), making it subject to seizure and forfeiture pursuant to 18 U.S.C. § 981 (b) and (a)(1)(A).

52.  In addition, the SUBJECT PROPERTY is subject to seizure pursuant to 18 U.S.C. § 982(a)(2)(A) and 21 U.S.C. § 853(f) because there is probable cause to believe that the SUBJECT PROPERTY  would, in the event of conviction on the alleged underlying offenses, be subject to criminal forfeiture, and an order under 21 U.S.C. § 853(e)(providing for restraining orders and injunctions) would not be sufficient to assure the availability of property for forfeiture.


_____/s/_____
Joseph J. Kacic II
Special Agent
Internal Revenue Service,
Criminal Investigation


Attested to by the applicant in
accordance with the requirements Fed. R.
Crim. P. 4.1 by telephone
this 16th day of December 2024.


_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE

# APPENDIX A

| Item | Date of Transaction | Description of Transaction | Disposition of Funds | Transaction Amount |
|------|---------------------|---------------------------|----------------------|--------------------|
| 1  | 05/20/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 2  | 05/21/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 3  | 05/21/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $5,000.00 |
| 4  | 05/22/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 5  | 05/27/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 6  | 05/27/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $10,000.00 |
| 7  | 05/27/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $10,000.00 |
| 8  | 05/27/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $10,000.00 |
| 9  | 05/27/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $10,000.00 |
| 10 | 05/28/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 11 | 05/28/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $10,000.00 |
| 12 | 05/29/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 13 | 05/29/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $10,000.00 |
| 14 | 06/01/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 15 | 06/01/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $10,000.00 |
| 16 | 06/02/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 17 | 06/02/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 18 | 06/02/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 19 | 06/02/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 20 | 06/03/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 21 | 06/03/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 22 | 06/04/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 23 | 06/04/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |

| Item | Date of Transaction | Description of Transaction | Disposition of Funds | Transaction Amount |
|------|---------------------|----------------------------|----------------------|--------------------|
| 24 | 06/05/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 25 | 06/05/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 26 | 06/08/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 27 | 06/08/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 28 | 06/09/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 29 | 06/09/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 30 | 06/09/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 31 | 06/09/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 32 | 06/10/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 33 | 06/11/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 34 | 06/11/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 35 | 06/12/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 36 | 06/12/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 37 | 06/15/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 38 | 06/15/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 39 | 06/16/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 40 | 06/16/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 41 | 06/16/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 42 | 06/16/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 43 | 06/17/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 44 | 06/17/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 45 | 06/18/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 46 | 06/18/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 47 | 06/19/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 48 | 06/19/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |

| Item | Date of Transaction | Description of Transaction | Disposition of Funds | Transaction Amount |
|---|---|---|---|---|
| 49 | 06/22/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 50 | 06/22/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 51 | 06/23/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 52 | 06/23/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 53 | 06/23/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 54 | 06/23/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 55 | 06/24/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 56 | 06/24/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 57 | 06/25/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 58 | 06/25/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 59 | 06/26/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 60 | 06/26/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 61 | 06/29/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 62 | 06/29/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 63 | 06/30/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 64 | 06/30/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 65 | 06/30/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 66 | 06/30/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 67 | 07/01/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 68 | 07/01/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 69 | 07/02/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 70 | 07/02/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 71 | 07/03/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 72 | 07/03/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 73 | 07/06/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |

| Item | Date of Transaction | Description of Transaction | Disposition of Funds | Transaction Amount |
|------|---------------------|---------------------------|----------------------|--------------------|
| 74 | 07/07/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 75 | 07/07/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 76 | 07/07/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 77 | 07/07/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 78 | 07/07/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 79 | 07/08/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 80 | 07/08/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 81 | 07/09/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 82 | 07/09/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 83 | 07/10/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 84 | 07/10/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 85 | 07/13/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 86 | 07/13/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 87 | 07/14/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $25,000.00 |
| 88 | 07/15/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 89 | 07/15/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 90 | 07/15/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| 91 | 07/15/2020 | Wire Transfer | From JPMC 3017 to Prime Trust | $20,000.00 |
| | | | **TOTAL** | **$1,925,000** |

# APPENDIX B

